George DeGraw, Appellee, v. Bettendorf Axle Company, Appellant.

**MASTER AND SERVANT:** Dangers, Obvious, Known and Appreciated—Failure to Warn—Assumption of Risk. Dangers obvious and known to and appreciated by the servant call for no warning from the master. Such dangers, incident to the work, are assumed by the servant.

PRINCIPLE APPLIED: A carpenter of 20 years' experience in all lines of carpentering had been sheeting a quarter-pitch roof. Snow, ice, sleet and frost were on the roof. He had worked under these conditions for some time. The work was stopped for two weeks. The weather was stormy, with snow falling. At the end of the two weeks, he was told generally, and without warning as to danger, to go upon the roof and, with other workmen, complete the sheeting. He had not seen the roof in the meantime, but had no reason to think it different than when he left it. He knew ice was to be expected on a roof in January. While getting nails from a keg on the roof preparatory for work, he slipped and fell through an opening in the roof which had not been sheeted. *Held,* the danger was obvious, known and appreciated; there was no duty to warn; and the danger, being incident to the work, was assumed by the servant.

*Appeal from Scott District Court.*—Hon. M. F. Donegan, Judge.

Friday, June 18, 1915.

Rehearing Denied Saturday, October 2, 1915.

Action to recover damages for personal injuries. Trial to a jury and judgment for plaintiff for $1,000. Defendant appeals.—*Reversed.*

*Cook & Balluff,* for appellant.

*Helmick & Boudinot* and *George W. Scott,* for appellee.

Preston, J.—The petition alleges that on January 14, 1913, plaintiff was in the employ of defendant as a carpenter and engaged in roofing a new foundry building; that on said day he was directed by a foreman of defendant to go upon the roof of said building with a fellow workman and complete the sheeting on said roof; that he had worked on said roof a number of days previous thereto, until inclement weather compelled the cessation thereof; that he went upon said roof and proceeded to comply with said order; that in the exercise of his duties, and while exercising due care, he went near a keg of nails, previously left on said roof for the use of workmen, and procured nails for the use of himself and the other workman; that, unknown to him, ice had formed upon the melting snow near the opening which they were about to sheet over, and on stooping to commence work, said ice caused him to slip and fall from the roof into said opening, his fall being arrested about eight feet down. Injuries were inflicted, the extent of which are not in dispute upon this appeal. The two grounds of negligence submitted to the jury by the trial court were as to whether defendant failed in its duty to furnish plaintiff a safe place in which to work, or failed in its duty to warn plaintiff of the dangers incident to working on the roof. The defendant introduced no evidence. At the close of plaintiff's evidence, defendant moved for a directed verdict, which motion was overruled. In the assignment of errors, appellant challenges the sufficiency of the evidence to show any negligence of the defendant. It is also said that the injury to plaintiff resulted from one of the dangers inherent in the business of a carpenter engaged in laying roofs in the winter time, which was open and obvious, and of which plaintiff assumed the risk. Some of the instructions are also complained of.

Because of appellant's contention that the evidence does not warrant a recovery, it will be necessary to refer to so much of it as bears upon the cause of plaintiff's injury, somewhat in detail. Plaintiff testified:

"I am forty years old; was employed by defendant as a carpenter and had been in their service from about June until January when I met with this accident. I did nearly all the roof work on the foundry building. The building was about as long as a city block, one hundred eighty or two hundred feet wide, and I think the peak was seventy feet high, and the eaves about forty feet high. I was engaged in sheeting that roof. We had nails on the roof for the roof already up there, sitting up on the roof in a keg. I think the work ceased around about two weeks before I got hurt. During that two weeks we had stormy weather, snow. Q. While you were working up there previous to being hurt, was there any snow or ice or sleet or frost? A. Why, yes, there was snow and ice on the roof and had been for two weeks ahead of that. There had been frost on the roof when I was working previous to the time I was hurt, and we had worked under those conditions. Millis was working with me the morning I got hurt. The morning of the accident, the foreman of the carpenters at the foundry told me—'You boys will have to go up there and put that roof on; the bricklayers have got done. We want to get that roof on right away to enclose the building. We will have to take and put the windows in before we take the scaffold down,' that is all the directions I had. In obedience to that order, I went up and started to put the roof on. I told Millis I would go up and get the nails, and I would nail the upper end on account that I had rubbers on and he didn't have any. I got the nails and put enough for him and me both in my apron and went to go down to handle my end and hand him his nails, and I slipped and fell. There was frost on the roof that I could see, and there was ice under the frost that I didn't see. I did not walk or proceed over the roof any different from what I had previously done. We had nails up there to finish up this roof. There was about half a keg of nails up there. We went up and I says, 'I will go up and get the nails,' because I knew where they were, and he says, 'All

right.' When I came back with the nails, then I slipped. I set the nails on a snow bank on top of the roof—a little drift of snow. I was at work about eight or ten feet from the opening. From there I slid down, eased myself down easy. By that, I mean as a general thing you get down on your knees and slide down until you get to where you want to work; you don't stand up and walk down; I sat down to get down, to where I was going to work and hand him the nails, and of course I slipped off. We always had a ladder somewhere around before that, and I would walk down to where the ladder would stand. We always crept down to that ladder on the edge of the roof. I started to work on that roof about twenty minutes after nine in the morning, and I just got the nails to start to work and then I fell. It couldn't have been over ten minutes. On the morning I was hurt, I didn't know the condition of the roof. I hadn't been up, and I hadn't seen it or been near it. I did not have any reason to think it was different from what it was when I had worked there before. We had worked on it before with frost up there; whenever there would be frost up there the roof was bad, we had done lots of work up there with frost up there on the roof. I fell between twelve and fourteen feet and struck the crane beam; there was no scaffolding on the inside of the building; it was all outside. I fell on the inside.''

On cross-examination, he testified:

''The building was a foundry, with a ventilation cupola on top. The roof was a slanted roof of twenty-four feet; there was a straight wall that rose up a certain distance higher and a plain gable roof on top of that. There was more than forty feet left to be covered, but that was all we got to on account of the brick work at that time. The bricklayers had got done with about that much. I mean there was a space of about forty feet north and south by ten feet east and west that had to be covered. We were putting ten-foot lengths on at that time at the lower edge. The fourteen-

foot lengths were already on. We were to cover a space ten by forty that morning. I have been a carpenter for about twenty years; have done pretty near everything in that line, building and house building, and I have helped put on a great many roofs in that time. This roof was about a quarter pitch roof. In the twenty-four feet, it would have a drop of six feet. It isn't a very steep roof. They build them steeper than that, and I have worked on them steeper than that. The sheeting in the roof was inch and a half matched stuff like flooring, and when they laid them up tight together there wasn't any cracks in the roof. The boards ran lengthwise up and down. That kind of roof didn't give me as good a foothold as boards laid for shingles, with cracks between them. I have lived in this vicinity since last May or June, and before that in Chicago nearly all my life; I had worked in a climate where ice and snow comes in winter time and I knew at the time of this accident that snow and ice were to be expected in the month of January. I knew that working on a roof in January there was apt to be both snow and ice on the roof at any time. That is peculiar to this climate. I knew that any time I was doing roof work in the winter time I might find slippery places by reason of frost and ice or snow. There was a scaffold on the outside seven feet wide and only four feet below the eaves, so the only place where I could fall any distance was to slip through the unfinished hole in the roof. I had no special orders when I went up there except to go up and finish the roof; that was all. I knew from the work I had done there previously how that roof was to be laid. The board would be driven into its tongue and groove until they came together and nailed. I would nail a board at the upper end and Millis would nail the lower end. It was pretty cold around January and we wore rubbers. I had a pair of what they call German socks and rubbers on them. When I got the keg of nails I set it down about eight or ten feet from the opening in the roof. I did not see more than frost on the roof, only this snow

and froze. There was snow in places; kind of little drifts along, little piles of snow on the roof. I knew from past experience that where snow melted in the winter time and froze again there was likely to be ice. I had left those nails up there myself previously. Before I got them, they were sitting back just on the old building. The keg stood above the opening. That is where I went to get them and got them and carried them back to where we were going to work. In order to do that, I walked over the slanting part of the roof that was already laid. I got the nails safely, and then I undertook to go down to where I was going to work. I crawled over the iron beam to get from the scaffold over to the fourteen-foot boards that were laid. I knew just how much of the roof had been finished before I went up. I knew that there hadn't been anybody up for around about two weeks. We had been working inside. Mr. Millis and I were the first ones to be sent up there after the lay off of two weeks. They had canvas where the two buildings came together so the snow wouldn't get in and cold air get on the moulders. This canvas was not where we were going to board.''

Robert Happs testified:

''I was helping with the carpenter work at the time plaintiff got hurt. I was working for the defendant helping build scaffolding and nailing on roof and working around there. The snow was above where the roof was where plaintiff was working, right at the edge where he had come down to go to work on the roof, just a little above. I suppose he was going to nail right on the edge where I did and the snow and ice were right there alongside of it in places there. Q. Could you see the ice and frost? A. Oh, yes, you could see them; it was in a pile and a person could see that all right. Q. Was there frost on the ice? A. It was snow. It wasn't frost at all. It was snow. Q. On the ice? A. On the ice because it rained and sleeted and snowed that night and the

next day they went to work up on the roof. They went up there about ten o'clock. I noticed the place where Mr. DeGraw slipped. You could see where he slipped. There was ice and snow; there wasn't any frost. There was a heavy frost that morning. I suppose, snow and ice and sleet together, I should say. The ice and snow and frost at that time looked just the same as it always looked to anybody when they see it there on the boards.''

Witness Brimmer testified he was working about twenty feet below plaintiff; that there was frost and ice and snow on the roof. This is the substance of all the testimony as to the condition of the roof.

The order to plaintiff and the others was general and simply designated work to be done by them, not an order given in the actual direction of the work. It is true, of course, as contended by his counsel, that plaintiff was not required to make an independent investigation, but may assume his employer had performed the duty required of it as to the condition of his working place, unless the defects and dangers were obvious and known and appreciated by him, and it is equally true that the defendant would have no right to send him into a place where there is hidden danger without warning; but, under the evidence in this case, there was nothing concealed or hidden. There is no duty of the employer to warn the employe of dangers which are obvious and known and appreciated by the employe. Here the evidence, without conflict, shows that the defect and the danger were obvious. The evidence of plaintiff himself, taken all together, so shows. True, he says in one place in his testimony that he did not know there was ice under the frost, but in another place he says: "I did not see more than frost on the roof only this snow and *froze*. I knew from past experience that where snow melted in the winter time and froze again there was likely to be ice."

MASTER AND SERVANT: dangers obvious, known and appreciated: failure to warn: assumption of risk.

He was an experienced carpenter, accustomed to working on roofs in the winter in this climate. He knew the effect of melting snow and freezing and that ice was to be expected. He had quit work on this same roof two weeks before because of bad weather. He knew there had been cold, stormy weather—snow—during that two weeks. He and Millis were the first ones to go up on the roof when work was resumed, and the plaintiff then saw for himself the frost, snow and ice on the roof where he was hurt and says it had been there two weeks before that time. His other witnesses also so say. Plaintiff was better informed as to the condition of the roof and the danger than his foreman or the defendant. Everything of which he could have been warned was known by him. As said by Mr. Justice Weaver, in *Kerlin v. Railway Co.*, 149 Iowa 440, 447: "So, too, if the danger to be apprehended in obeying the order is better known to the servant than to the master giving the order, or if the servant fully appreciates the nature and extent of the risk to which he is exposed, he is held to have assumed the risk."

Other cases hold the same. Without further discussion, we think, under the evidence, there was no duty to warn, and that plaintiff, knowing the defects and danger, assumed the risk, and that this risk was incident to the work. Other questions are discussed, but we deem it unnecessary to notice them, because the conclusion we have reached decides the case.

The motion to direct a verdict should have been sustained. Other and different evidence may be produced on another trial, so that the cause is reversed and remanded.

Deemer, C. J., Weaver and Evans, JJ., concur.